# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| Stanley G. Booth, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14 CV 50347 |
| | ) | Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Stanley Booth brings this action under 42 U.S.C. § 405(g), challenging the denial of disability benefits. As explained below, the case is remanded.

## INTRODUCTION

Located within the Western Division of the U.S. District Court for the Northern District of Illinois is the quaint city of Woodstock, Illinois. Woodstock is known for a variety of reasons. For example, at one time, Woodstock was known as "Typewriter City," due to the number of typewriters manufactured there. Moreover, Eugene V. Debs—the Bernie Sanders of the day— was once imprisoned in Woodstock. Additionally, for a small municipality, Woodstock boasts an impressive list of several notable current and former residents, including Orson Welles, Chester Gould, Jessica Biel, Bryan Bulaga, and "Woodstock Willie," the groundhog derived from the classic 90's rom-com *Groundhog Day.*

Unfortunately, for many federal judges—including this one—Social Security appeals oftentimes are reminiscent of *Groundhog Day.*[1]  After completing an analysis of the parties'

---

[1] Starring Bill Murray and Andie McDowell, *Groundhog Day* has held up well over time, despite being released nearly a quarter of a century ago. It currently has an 8.1 rating on IMDB and a 96% fresh rating on Rotten Tomatoes. www.imdb.com/title/tt0107048/; www.rottentomatoes.com/m/groundhog_day/. In

briefs, reviewing an administrative record and issuing an opinion (which, more often than not, results in a remand),[2] a judge picks up another appeal only to be confronted with the same type of facts, problems, and arguments. Appeals are littered with recurring issues, including, but not limited to, the dreaded "boilerplate," the *Chenery* doctrine, and, of course, the treating-physician rule. Sometimes, the claimants in Social Security appeals may not be the most pristine parties. They can have criminal histories, drug abuse issues, and mental health concerns, which can all interrelate. *See Koelling v. Colvin*, No. 14 CV 50018, 2015 U.S. Dist. LEXIS 140754, *1-2 (N.D. Ill., Oct. 16, 2015). But this Court has warned the Administration and its administrative law judges ("ALJs") that "[b]enefits cannot be denied simply because an applicant is unsympathetic, unlikeable and not entirely credible. Administrative law judges must still follow fundamental statutory, regulatory and case-law requirements, including, but not limited to, complying with the treating physician's rule." *Swagger v. Colvin*, No. 14 CV 50020, 2015 U.S. Dist. LEXIS 151502, *2 (N.D. Ill., Nov. 4, 2015). This case is no different in the issues raised, character portrayed, or opinion made.

## BACKGROUND

Aside from knee problems, which are not a focus here, plaintiff's physical and mental problems stem primarily from an October 2006 assault that, according to plaintiff, "left him badly beaten and psychologically scarred." Dkt #10 at 2. Plaintiff's frontal lobe and eye socket were fractured, and he suffered a large subdural hematoma in his brain. He had multiple surgeries including a craniotomy, and also had a plate and screws installed in his skull. After the

---

addition to the cinematic excellence of the film, the undersigned freely admits to possessing fond memories of the quarries of McHenry County, one of which was aptly captured while meteorologist Phil instructs quadruped Phil: "Don't drive angry."

[2] *See, e.g., Dettloff v. Colvin*, No. 12 C 5700, 2015 U.S. Dist. LEXIS 80285, *7 (N.D. Ill. June 22, 2015) (noting a 70% reversal rate); *Freismuth v. Astrue*, 920 F. Supp. 2d 943, 945 (E.D. Wis. 2013) (identifying reversal rate ranging between 73% to 84%).

incident, he has had chronic headaches; sometimes as many as four a week. Over this time, and even well before the assault, plaintiff was treated by his regular physician, Dr. Adekola A. Ashaye, who prescribed various medications for plaintiff over the years. Plaintiff also has made multiple trips to the emergency room to treat his headaches, as well as other issues. Beginning in 2011, he attended therapy sessions supervised by a counselor named Traci Stamm who diagnosed plaintiff with major depressive disorder and post-traumatic stress disorder ("PTSD"). Both Dr. Ashaye and Ms. Stamm have given opinions about plaintiff's work-related limitations.

A hearing was held before the administrative law judge on May 28, 2013. In an opening statement, plaintiff's counsel argued that plaintiff's recurring headaches would cause him to "miss too many days from work" and would prevent him from "stay[ing] on task." R. 32. The ALJ then asked plaintiff questions about discrete issues the ALJ found to be contradictory or suspicious.[3]

After plaintiff testified, the ALJ called Mark Oberlander, a psychologist, as an impartial medical expert. His testimony is important because the ALJ gave it "significant weight." Dr. Oberlander began his testimony by questioning plaintiff's assertion that he was still seeing Ms. Stamm at the time of the hearing or whether the therapy relationship ended the year before. After some effort was made, without success, to resolve this issue, the ALJ asked Dr. Oberlander to render his opinion based on the documents then available.

Dr. Oberlander acknowledged that plaintiff had a "documented" brain injury. But he also concluded, based on his own assessment, that plaintiff had several personality disorders based on

---

[3] She asked plaintiff about (among other things) riding his "bicycle everywhere"; why he had not tried to get his GED; why he reported "absolutely no income" for the past 15 years; why he failed to see a neurologist; why he "frequently" went to the emergency room and "frequently demand[ed] pain medication"; whether any doctor suggested he may have "an addiction or a problem with pain medication"; why he had not had his teeth problems fixed when they "may be contributing to [his] headaches"; what his motives were when he broke into a car and was arrested; and whether medications prescribed by Dr. Ashaye helped. R. 34-47.

his frequent emergency room trips. Dr. Oberlander found that plaintiff did not meet a Section 12 mental health listing and that he had the ability to do simple and routine work. The ALJ noted that Dr. Oberlander's opinion "obviously" conflicted with Ms. Stamm's opinion. He explained that Ms. Stamm's answers on one questionnaire (Ex. 14F) lacked validity and reliability. R. 62. According to the ALJ, "when she tells us in item five [*i.e.* one of the questions on Ex. 14F], use public transportation, yet in her opinion, he is totally incapable of doing that, yet in her narrative report [*i.e.* Ex. 17F], she says that he has not only used [his] bicycle but uses public transportation. With that kind of discrepancy, it makes me question the rest of her functional assessment." R. 63. Essentially, the ALJ invoked the doctrine of *falsus in uno, falsus in omnibus* (false in one, false in all), which is a principle of dubious applicability in the 21st Century. *See United States v. Edwards*, 581 F.3d 604, 612 (7th Cir. 2009).

On August 23, 2013, the ALJ issued her opinion, finding that plaintiff had the following severe impairments: "headaches, status post craniotomy; right knee pain/mild tear; organic brain disorder; dysthymia; post-traumatic stress disorder; somatoform disorder; anti-social and dependent personality disorder; and history of poly-substance use and abuse." R. 12. She held that plaintiff did not meet one of the Section 12 mental health listings. But the ALJ found that plaintiff had moderate – as opposed to marked – impairments in the first three Paragraph B criteria (*i.e.* activities of daily living, social functioning, and concentration). The ALJ found that these impairments were not more severe because (a) plaintiff was "able to ride his bicycle and take public transportation," (b) he had a relationship with his mother and had girlfriends, and (c) he listened to the radio. R. 13.[4] In the residual functional capacity ("RFC") evaluation, the ALJ found that plaintiff was capable of performing sedentary work subject to certain exceptions.

---

[4] Although not raised as an issue on appeal, the ALJ's analysis is suspect. On remand, the ALJ must conduct a more thorough and critical analysis under Section 12.

# DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build this logical bridge on behalf of the ALJ or Commissioner. *See Mason v. Colvin*, No. 13 C 2993, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014).

On appeal, plaintiff raises three arguments: (1) the ALJ failed to apply the treating-physician rule;[5] (2) the ALJ erred in the credibility determination; and (3) the ALJ failed to

---

[5] The Court recognizes that this rule is more accurately termed the "treating-sources rule," but will use the more familiar "treating-physician rule" terminology. For a thorough discussion of the treating-physician rule, *see* Johnston, *Every Picture Tells a Story: A Visual Guide to Evaluating Opinion Evidence in Social*

consider the testimony of plaintiff's mother. Because the first argument is the predominant one, the Court will primarily focus on it. The treating-physician rule—and the systematic erroneous application of the rule by ALJs—has been the subject of numerous opinions by this Court and many remands. *Edmonson v. Colvin*, No. 14 CV 50135, 2016 U.S. Dist. LEXIS 32019, *16-20 (N.D. Ill. Mar. 14, 2016); *Vandiver v. Colvin*, No. 14 CV 50048, 2015 U.S. Dist. LEXIS 163328, *6-10 (N.D. Ill. Dec. 7, 2015); *Carlson v. Colvin*, No. 13 CV 50341, 2015 U.S. Dist. LEXIS 129905, *19-21 (N.D. Ill. Sept. 28, 2015); *Koelling v. Colvin*, No. 14 CV 50018, 2015 U.S. Dist. LEXIS 140754, *27-29 (N.D. Ill. Oct. 16, 2015); *Taylor v. Colvin*, No. 14 CV 50006, 2015 U.S. Dist. LEXIS 111300, *16-17 (N.D. Ill. Aug. 4, 2015); *Duran v. Colvin*, No. 13 CV 50316, 2015 U.S. Dist. LEXIS 101352, *27-28 (N.D. Ill. Aug. 4, 2015). This Court is not alone in the Northern District of Illinois in recently remanding cases because of ALJs' erroneous application of the treating-physician rule. *See, e.g., Gonzalez v. Colvin*, No. 14 CV 5635, 2016 U.S. Dist. LEXIS 75707, *13-16 (N.D. Ill. June 10, 2016); (Rowland, J.); *Koopers v. Colvin,* No. 15 CV 5471, 2016 U.S. Dist. LEXIS 73082, *13-15 (N.D. Ill. June 6, 2016) (Martin, J.); *Stubbe v. Colvin*, No. 14 CV 10442, 2016 U.S. Dist. LEXIS 64554, *9-14 (N.D. Ill. May 17, 2016) (Cox, J.); *Montgomery v. Colvin*, No. 14 CV 10453, 2016 U.S. Dist. LEXIS 55074, *15-19 (N.D. Ill. Apr. 26, 2016) (Cox, J.); *Fugate v. Colvin*, No. 14 CV 4240, 2016 U.S. Dist. LEXIS 33700, *25-28 (N.D. Ill. Mar. 16, 2016) (Rowland, J.); *Harlston v. Colvin*, No. 14 CV 1606, 2016 U.S. Dist. LEXIS 25286, *24-30 (N.D. Ill. Feb. 29, 2016) (Mason, J.); *Lindo v. Colvin*, No. 14 CV 1106, 2016 U.S. Dist. LEXIS 23262, *5-9 (N.D. Ill. Feb. 24, 2016) (Valdez, J.); *Padua v. Colvin*, No. 14 CV 566, 2016 U.S. Dist. LEXIS 21877, *21-26 (N.D. Ill. Feb. 23, 2016) (Valdez, J.); *Accurso v. Colvin*, No. 12 CV 8394, 2016 U.S. Dist. LEXIS 13330, *41 (N.D. Ill. Feb. 4, 2016) (Cole, J.);

*Security Appeals*, The Circuit Rider, 28 (April 2016); Johnston, *Understanding the Treating Physician Rule in the Seventh Circuit: Good Luck!*, The Circuit Rider, 29 (November 2015).

*Schickel v. Colvin*, No. 14 CV 5763, 2015 U.S. Dist. LEXIS 165463, *38-41 (N.D. Ill. Dec. 10, 2015) (Finnegan, J.); *Middleton v. Colvin*, No. 13 CV 4483, 2016 U.S. Dist. LEXIS 151847, *27-32 (N.D. Ill. Nov. 9, 2015 ) (Kim, J.); *Shaevitz v. Colvin*, No. 13 CV 1721, 2015 U.S. Dist. LEXIS 103480, *6-10 (N.D. Ill. Aug. 6, 2015) (Gilbert, J.); *Moore v. Colvin*, No. 13 CV 7843, 2015 U.S. Dist. LEXIS 65901, *31-38 (N.D. Ill. May 19, 2015) (Shenkeir, J.). This case is another example of a bungled application of the rule, requiring remand.

**I.      The Treating-Physician Rule.**

Plaintiff argues that the ALJ violated the treating-physician rule by failing to give "controlling" weight to Dr. Ashaye's and Ms. Stamm's opinions and by not applying the checklist under that rule. The Government argues that this rule is "very deferential" and "lax" and asserts that the ALJ implicitly applied the checklist. The Government characterizes Dr. Ashaye's and Ms. Stamm's opinions as "extreme" and thus argues that they were justifiably given "no weight," and, in contrast, Dr. Oberlander's opinions were properly given "significant weight." As explained below, the Court disagrees with these arguments. The Court agrees, however, with the Government's argument that Ms. Stamm's opinion cannot be given controlling weight. As a therapist, Ms. Stamm is not an "acceptable medical source," and therefore, her opinion cannot receive controlling weight. *Stewart v. Colvin*, No. 14-cv-1529, 2016 U.S. Dist. LEXIS 1529, *22 (C.D. Ill. Jan. 7, 2016); 20 C.F.R. 404.1527(a)(2), (c)(2).

The treating-physician rule generally requires the ALJ to "consider *all*" of the following factors—referred to as the checklist factors—in weighing *any* medical opinion:  (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors supporting or contradicting the opinion.

20 C.F.R. § 404.1527(c); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (checklist factors help the ALJ "decide how much weight to give to the treating physician's evidence"). But within the weighing process, a treating-physician opinion receives particular consideration. It is entitled to "controlling weight" if it is (i) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and if it is (ii) "not inconsistent with the other substantial evidence in [the] case." § 404.1527(c). The ALJ must first assess whether to give the treating physician's opinion controlling weight. If the ALJ does not give the opinion controlling weight under this first step, the ALJ cannot simply disregard it, but must proceed to the second step and determine what *specific* weight it should be given by using the checklist factors. *Moss v. Astrue*¸ 555 F.3d 556, 561 (7th Cir. 2009). These steps are separate and distinct, ALJs are not permitted to conflate them. *Edmonson*, 2016 U.S. Dist. LEXIS 32019, at *16 ("The ALJs routine conflation of these steps is maddening."); *Taylor*, 2015 U.S. Dist. LEXIS 111300, at *16-17. As explained below, the ALJ did not follow these two steps.

### A.     Dr. Ashaye

Dr. Ashaye's opinions were set forth on a questionnaire entitled "Medical Opinion Re: Ability To Do Worked-Related Activities (Physical)." R. 377-42. The ALJ analyzed this opinion in the following paragraph:

> Dr. Ashaye opined the claimant could lift and carry a maximum of 10 pounds (12F/1). Additionally, Dr. Ashaye opined the claimant could stand, walk, and sit for less than two hours maximum out of an 8-hour workday (12F/1). Dr. Ashaye opined the claimant can sit or stand for 20 minutes before needing to change position, and would need to shift at will from sitting or standing/walking. Additionally, he would need to lie down at unpredictable intervals during a work shift. Dr. Ashaye also opined the claimant never can twist, stoop, bend, crouch, climb stairs, or climb ladders. He also opined the claimant would miss work about or more than three times per month (12F/3-5). *Dr. Ashaye noted the claimant's medications relieved his headaches (10F/6, 7F).* **This evidence is inconsistent with Dr. Ashaye's finding that the claimant was poor or marked in every area of functioning. Therefore, the undersigned gives no weight to Dr. Ashaye's opinion.**

R. 18 (italics and bolding added).

As an initial point, this paragraph requires some unpacking to avoid confusion. The first portion (the part neither bolded nor italicized) is a straightforward summary of Dr. Ashaye's medical opinion from the questionnaire. The last two sentences, which the Court has bolded, contain the ALJ's analysis. Tucked between them is the italicized sentence. One might reasonably assume this sentence is a further summary of the questionnaire, but it is not. Rather, this sentence is based on two exhibits containing portions of Dr. Ashaye's treatment notes. The ALJ excised select observations from a few specific doctor visits and extrapolated a larger conclusion—one never explicitly made by Dr. Ashaye—that plaintiff's headache medications generally worked to relieve his headaches. The ALJ then concluded that this jerry-rigged observation, which she foisted on Dr. Ashaye, was at odds with Dr. Ashaye's opinions in the questionnaire. The result is a mischaracterization of Dr. Ashaye's opinions.

Turning to the ALJ's analysis in the last two sentences, the Court finds that it is conclusory. The analysis consists of only two sentences and seems to point to only one specific alleged inconsistency, which is the one discussed above about medications supposedly relieving his headache. These two sentences obviously do not constitute an explicit analysis of either the two parts to Step One, or the six checklist factors required by Step Two. In this Court's view, the failure to explicitly analyze these criteria is itself a ground for a remand. *See, e.g., Duran v. Colvin*, No. 13 CV 50316, 2015 U.S. Dist. LEXIS 101352, *8-9 (N.D. Ill. Aug. 4, 2015).

However, even if this Court were to follow the implicit approach advocated by the Government, it would still find remand warranted. It is not clear that the ALJ implicitly applied the checklist. Instead, the ALJ's "analysis" is merely a breezy drive by. *Schaevitz v. Colvin*, No. 13 C 1721, 2015 U.S. Dist. LEXIS 103480, *8 (N.D. Ill. Aug. 6, 2015). As for the first two

factors—length of treatment and nature and extent of treatment relationship—the ALJ never set forth the basic facts of the relationship. Although the ALJ mentioned a few specific visits with Dr. Ashaye, the ALJ never tallied up the number of visits, nor surveyed the chronological breadth of the relationship. The impression created is that plaintiff only saw Dr. Ashaye sporadically and that the relationship began in 2011. Apparently, the ALJ was unaware that the treatment relationship was, in fact, longer and more extensive, spanning from 2001 (well before the 2006 assault) and continuing up until the hearing. According to a chronology of his doctor visits, plaintiff saw Dr. Ashaye approximately thirty times (a total not including visits after July 2012). R. 452-59. In short, the ALJ "inappropriately undervalued" Dr. Ashaye's longitudinal view of plaintiff's conditions. *See Scrogham v. Colvin*, 765 F.3d 685, 687-88 (7th Cir. 2014) (remanding because "the ALJ inappropriately undervalued the opinions of Mr. Scrogham's treating physicians, whose longitudinal view of Mr. Scrogham's ailments should have factored prominently into the ALJ's assessment of his disability status").

As for the fifth factor—degree of specialization—the ALJ did not explicitly discuss it. Dr. Ashaye was plaintiff's general physician. It is true that he is not a neurologist, but the ALJ and Dr. Oberlander agreed that plaintiff had an organic brain disorder capable of causing recurring headaches. Therefore, the relevant question was the frequency and intensity of those headaches, as well as the effectiveness of the medication. Because Dr. Ashaye saw plaintiff often and was actively involved in prescribing medications, he should presumably be considered qualified to opine about these matters. Moreover and critically, Dr. Ashaye's opinions were unopposed. At the hearing, Dr. Oberlander made a few passing observations about plaintiff's headaches, but later conceded he had no expertise in this area. Here is the exchange with plaintiff's counsel:

Q       And you're not rendering an opinion regarding the frequency of []
        headaches, are you?

A       I am not.

Q       That would be more of a medical determination?

A       That's how you would define it?

Q       Well, he's been receiving treatment for many, many years with Dr. Ashaye
        his medical doctor, and you don't have the qualifications to disagree with
        Dr. Ashaye's opinions, do you?

A       Regarding the frequency of his headaches, no.

Q       Or his medical conditions?

A       Correct.

R. 65.

The remaining factors—supportability (3), consistency (4) and other factors (6)—were

also not addressed in any meaningful way. As noted above, there is no evidence that Dr.

Ashaye's opinions were inconsistent with any other opinions (other than Dr. Oberlander's). For

example, Dr. Ramchandani, a consultant, did not question plaintiff's claims of "having chronic

right frontal headaches" since the assault. R. 300.

Throughout the opinion, the ALJ offered several arguments which, although not

specifically tied to Dr. Ashaye's opinions, could possibly be viewed as indirect criticisms. First,

the ALJ asserted repeatedly that plaintiff only sought routine or conservative treatment. *See* R.

16 ("treatment has been essentially routine and/or conservative in nature"); R. 16 ("throughout

2012, the claimant sought routine/conservative treatment for his headaches, by just seeking

medication refills"). However, because no medical provider testified on this issue, it is not

obvious that this treatment was routine or conservative.  The ALJ's opinion that the treatment

was "conservative" is a prime example of an ALJ impermissibly "playing doctor."  *Moon v.*

*Colvin*, 763 F.3d 718, 722 (7th Cir. 2014); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Contrary to the impression created by the ALJ, Dr. Ashaye did not explicitly opine that plaintiff's treatment was routine or conservative. Dr. Ashaye prescribed numerous medications, which were changed and adjusted at various points. *See, e.g.*, R. 365 (2/8/12 visit: "increase Propranolol"). As discussed below, the ALJ faulted plaintiff for not following through with a neurology referral. Although it is possible that a neurologist would have spotted an easy fix, this point is speculative without expert medical testimony.

Second, the ALJ speculated in several places that plaintiff's headaches were caused in part by unaddressed dental problems. [6] These assertions were based on sporadic complaints by plaintiff when he went to the emergency room and speculated that his tooth problems may have contributed to the pre-existing headaches. But Dr. Ashaye, who was aware of the ongoing dental problems, did not find that they altered his bottom-line conclusions about plaintiff's ability to work. Moreover, no doctor stated or suggested that these tooth problems were a significant cause of the ongoing headaches. Again, the ALJ impermissibly "played doctor." *Rohan*, 98 F.3d at 970.

Third, as noted earlier, the ALJ believed that plaintiff's medications "relieved" his headaches. But this broad conclusion is not substantiated by a fair review of the entire record. It is true, as the ALJ noted, that plaintiff in a few doctor visits reported that his medications had helped to some degree. However, this fact still leaves important issues unaddressed. For one

---

[6] *See* R. 15 ("the claimant needed a tooth pulled and had dental caries problems, which the record indicates may have contributed to his headache problems"); R 16 ("The claimant had problems with dental abscesses and toothaches, which likely contributed to his problems with headaches[.]"); R. 16 ("During one emergency room visit in 2013, the claimant was noted to have dental caries with an early dental infection, which was contributing to his headache. The claimant was advised to treat with his primary care physician (20F/60)."); R. 17 ("The claimant also had problems with dental pain (20F).").

thing, the ALJ does not explain what she means when she says the the medication "relieved" plaintiff's headaches. It is unclear whether plaintiff did not have a headache for a period of time or if any such headache was brought under control through those medications after some period of time. The latter scenario could still cause work disruption and absenteeism even though it could be argued the medication was "working" to some degree in mitigating the duration or intensity of the headache. The ALJ's self-constructed conclusion that the medications were generally effective on a consistent basis is undermined by both plaintiff's testimony and his treatment records. At the hearing, plaintiff was asked about whether his medication worked and stated "[s]ome, yeah," but then qualified his answer by stating: "Well I have headaches pretty much all the time, and it moves around my head. I have it in the front, the back, all around, and then the light, noises make me nauseous when I have the migraines, and I don't never feel good. I always have a headache." R. 40. He testified that the Neurontin also made him dizzy. The ALJ did not consider this testimony, nor the evidence in the record from emergency room visits that the medication was, at best, partially effective.[7]

In sum, for all the above reasons, the ALJ's opinion lacks sufficient indicia from which to conclude that she implicitly applied the checklist, even if the Court were to allow an implicit consideration of the checklist.

---

[7] *See, e.g.,* R. 513 (5/19/12: "He states for the last 3 days he has been having an exacerbation of his chronic headache which feels exactly like his previous attacks. He takes Neurontin, Tylenol, and Motrin regularly but these have not helped his headache which is global and severe but not the worst headache of his life."); R. 530 (7/28/12 emergency room trip for "a headache this morning which quickly grew to full intensity and he started to become nauseated and vomit uncontrollably"); *see also* R. 601 (5/4/13 visit to Crusader where he saw Dr. Miller: "Pt also has headaches. This has also been a chronic problem. Will get dizzy from the Neurontin. Will get HA that is at different places on the head. Will have a daily headache. Will use Tylenol and ibuprofen to help with this.").

**B. Therapist Traci Stamm.**

Many of the same issues apply to Ms. Stamm's opinions, although a few differences exist as well. Ms. Stamm's opinions are set forth in three exhibits. The first two were relied on by Dr. Oberlander to find a supposed contradiction in Ms. Stamm's assessments. One exhibit is a checkbox-style form on which Ms. Stamm answered "Poor or none" to a series of questions. R. 447-50. The second exhibit is a letter where Ms. Stamm summarized in narrative form her opinion of plaintiff's problems. R. 470. The third exhibit is a letter submitted after the hearing confirming that, as plaintiff testified in the hearing, he was still seeing Ms. Stamm. R. 614.

The Government is right about one initial point. Because Ms. Stamm is a therapist and not a psychologist, her opinion cannot be given "controlling weight" under Step One. But this does not mean her opinions should be automatically and totally disregarded. Instead, the ALJ still must apply the checklist under Step Two. *See* SSR 06-03p.

The ALJ did not apply the checklist at all, either explicitly or implicitly. Set forth below is the ALJ's analysis of Ms. Stamm's opinions. It is interspersed with the analysis of Dr. Oberlander's opinions.

> In a mental health source statement, Traci Stamm, LCPC, the claimant's counselor, found the claimant had poor or no abilities to perform even unskilled work (14F/2-3). Ms. Stamm opined the claimant had major depressive disorder and post-traumatic stress disorder, and that he functions poorly in most areas of his life. She described the claimant as low functioning (14F/4). The undersigned assigns no weight to Ms. Stamm 's opinion, as the medical evidence as a whole contradicts her finding that the claimant was unable to perform any work.

> Dr. Mark Oberlander, Ph.D., an impartial psychological expert, noted Ms. Stamm's professional relationship with the claimant ended in 2012, but the claimant testified he saw Ms. Stamm a month ago. Dr. Oberlander, however, noted there were no records to support the alleged ongoing treatment. Notwithstanding the lack of those records, Dr. Oberlander testified he had enough evidence to make a determination and testified the claimant had an organic brain disorder, which resulted in frequent emergency room visits for pain medication for his headaches. Dr. Oberlander testified the claimant had an adjustment disorder, post-traumatic stress disorder, a

somatoform disorder. Dr. Oberlander opined that many of his emergency room disorders were related to disorders that had not been documented in the medical evidence, including an anti-social personality disorder, dependent personality disorder, and a poly-substance abuse disorder. These were attributed to the claimant's legal issues and drug and alcohol use.

\*      \*      \*

Dr. Oberlander testified that his opinion conflicts with Ms. Stamm's opinion, but noted the discrepancies in Ms. Stamm's findings, noting she found the claimant "poor" in almost every category, despite there being no basis for such marked findings. Furthermore, Dr. Oberlander noted that Ms. Stamm found the claimant unable to use public transportation, yet noted that he rode his [bike?] and used public transportation in her narrative, which also made him question her assessment of the claimant's functioning.

R. 16-17.

As with Dr. Ashaye's opinion, the ALJ only provided a conclusory analysis. As for the first two factors, the ALJ again did not set forth the basic details of the relationship. Recognizing this omission, the Government in its response brief states that plaintiff "saw Ms. Stamm for 20 sessions between August 2011 and March 2012." Dkt. #15 at 7.[8] But even this statement, which the ALJ never included, leaves out that plaintiff's relationship with Ms. Stamm continued after March 2012 and was still ongoing at the time of the hearing, a point confirmed by the record. R. 614. But, in her opinion, the ALJ makes no reference to this exhibit and, even worse, continued to dangle the suggestion that plaintiff was lying about the continuing therapy relationship. *See* R. 16 ("there were no records to support the alleged ongoing treatment" after 2012). The ALJ was completely wrong on this issue.

---

[8] This is a clear violation of the *Chenery* doctrine. The Court recognizes the Commissioner's counsel's desire to fix problematic ALJ decisions on appeal. But the Seventh Circuit has warned that this practice is sanctionable. *Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014). This Court's concern over the applicability of the *Chenery* doctrine to Social Security appeals—a concern shared by other judges of this circuit—is a question for the Seventh Circuit to resolve. *Swagger*, 2015 U.S. Dist. LEXIS 151502, at *2, n.1.

As for the degree of specialization, this factor was not analyzed systematically, although the ALJ briefly commented on the issue by giving credit to Dr. Oberlander's expertise in the field of psychology. *See* R. 17. It is true that Ms. Stamm is not a psychologist, but is listed instead as a therapist. But the ALJ did not emphasize this point, even though the Government now in its response brief focuses on it (again potentially violating the *Chenery* doctrine). Although Dr. Oberlander's more extensive and more formal psychology training is a factor that certainly may be noted, it is not necessarily dispositive. *See* SSR 06-03p ("it may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion").

As for the remaining factors, the ALJ only gave a conclusory statement that "the medical evidence as a whole contradicts [Ms. Stamm's] finding that the claimant was unable to perform any work." R. 16. The ALJ basically only offered one specific reason for rejecting Ms. Stamm's opinions. It is the argument made by Dr. Oberlander at the hearing that Ms. Stamm's answer to the one question on the questionnaire about using public transportation was contradicted by her narrative statement that plaintiff rode his bike to therapy sessions.

However, the Court finds that this one alleged discrepancy is a thin basis for rejecting Ms. Stamm's opinions entirely and giving "no weight" whatsoever to Ms. Stamm's opinions. First, the ALJ and Dr. Oberlander picked out one single question out of numerous other questions and observations from these three exhibits and never discussed the other evidence that favored plaintiff. Second, this issue—public transportation and bike riding—was not something Ms. Stamm personally observed nor identified as important to plaintiff's mental health problems. Third, the supposed contradiction is muddy. On an exhibit, Ms. Stamm commented only about

plaintiff's bike riding, stating that he "usually" rode his bike to therapy sessions. R. 470. She offered no opinion in this exhibit, insofar as this Court can tell, about public transportation, even though the ALJ claimed that she did so. R. 470-74. On the questionnaire, Ms. Stamm answered a question about public transportation, not bike riding. R. 450. A question therefore exists whether Ms. Stamm viewed bike riding as a form of public transportation. If she did not, then there is no obvious contradiction. Overall, relying on this one quasi-contradiction fails to provide assurance that the ALJ considered Ms. Stamm's opinions in light of a fair and thorough review of the entire record.

*   *   *

The ALJ's opinion is completely inadequate. Not only did the ALJ gloss over and then reject wholesale the opinions of Dr. Ashaye and Ms. Stamm, both of which reinforced each other, but the ALJ also, simultaneously, readily accepted Dr. Oberlander's opinion despite several problems.

First, Dr. Oberlander hinted that plaintiff was lying about still engaging in therapy with Ms. Stamm. Although it was proven after the hearing that plaintiff was not lying, Dr. Oberlander never saw this evidence, and it is thus impossible to know whether his suspicion about plaintiff lying colored his assessment. Second, Dr. Oberlander diagnosed plaintiff with several personality disorders—specifically, somatoform disorder, antisocial personality disorder, and dependent personality disorder. No other doctor diagnosed plaintiff with these conditions. These diagnoses were based on Dr. Oberlander's "own assessment" that plaintiff went to the emergency room an "unusually large number" of times and suspiciously sought narcotics. R. 59-60. Here again, Dr. Oberlander seems to be insinuating that plaintiff was fabricating or malingering in some respect. Although Dr. Oberlander did not define somatoform disorder, according to the preeminent

medical dictionary, the disorder is typified by physical symptoms "for which there are no demonstrable organic findings or known physiologic mechanisms," thus creating "a strong presumption that symptoms are linked to psychological factors." *Stedman's Medical Dictionary*, 571 (28th ed. 2006). The logical implication then is that such a diagnosis would call into question the assumption, made by both the ALJ and Dr. Oberlander, that plaintiff, in fact, had an organic brain disorder capable of causing his chronic headaches. R. 12, 59. Moreover, the emergency records indicate that many doctors seemed to accept that plaintiff was having headaches and even prescribed medication for it.[9]

For all the above reasons, the Court finds that this case must be remanded for failure to apply the treating-physician rule. It is important to note that the ALJ assigned *no weight* to the opinions of Dr. Ashaye and Ms. Stamm. The proper application of the treating-physician rule should result in the total rejection (*i.e.*, assigning "no weight") of the treating physician's opinion only on rare occasions. *See* SSR 96-2p ("A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.").

## II.     Remaining Two Arguments.

Plaintiff's remaining arguments are closely intertwined with the first one. As a result, the Court will only briefly comment on them, especially because this Court has already determined that a remand is appropriate.

---

[9] *See, e.g.* R 493 (9/26/10 hospital visit: "The patient had received Toradol and Reglan for his headache and this had decreased his headache significantly."); R. 509 (8/23/11 hospital visit where plaintiff complained about "headaches basically on an ongoing basis" and doctor stated: "The patient had an IV established. Indication: IV fluid hydration. He had Benadryl and Reglan IV. On repeat evaluation, he states that he is feeling significantly better.").

Plaintiff's second argument is that the ALJ erred in finding plaintiff not credible.[10] The ALJ's analysis is as follows:

> The claimant was not very credible regarding his impairments. The claimant's testimony contradicted the evidence of record. The claimant denied riding his bike frequently, which was noted throughout the file. The claimant also denied getting narcotics in the past two years, as noted in the medical evidence. Furthermore, the claimant was non-compliant with his treating physician recommendations. The claimant never saw a neurologist as he was advised to do in 2010 (1F). The claimant stated he did not have any friends, but he later admitted to having a girlfriend a year ago and a previous girlfriend he met through someone he knows. Furthermore, the claimant needed a tooth pulled and had dental caries problems, which the record indicates may have contributed to his headache problems. Finally, the claimant has no reported income for the past 15 years; this suggests there may be alternative reasons why the claimant currently is not working, other than due to any alleged disability.

R. 15.

Several of these points, such as the bike riding, were discussed above. Others rest on equivocal factual evidence or vague phrases. For example, the ALJ did not cite to any evidence to substantiate the claim that plaintiff lied about using narcotics in the last two years.[11] The ALJ concluded that plaintiff was non-compliant with his treating physician because he never saw a neurologist or got his dental problems fixed. But the ALJ failed to acknowledge plaintiff cited financial problems and difficulties in finding a doctor as part of the reason. R. 36, 52. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (holding that an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin"). The ALJ found it suspicious that plaintiff had no reported

---

[10]A credibility determination should be reversed only if it is patently wrong. *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015). However, an ALJ's decision may be reversed if the ALJ "fail[s] to adequately explain his or her credibility finding by discussing specific reasons supported by the record." *Id.*; *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (a credibility finding "must be specific enough to enable the claimant and a reviewing body to understand the reasoning").

[11] Plaintiff testified that he was taking Neurontin and that he viewed this as a "non-narcotic pain medication," and stated that he had not "asked for" any narcotic pain medication in "a couple years." R. 37. The ALJ did not discuss the definition of a narcotic nor cite to specific evidence suggesting that plaintiff was using one, nor specifically address plaintiff's claim that Neurontin is not a narcotic.

income for 15 years, but the ALJ did not acknowledge that plaintiff testified that he worked part-time and was paid in cash, that he lived with his mother, that he received a voucher from the Township, and that he had a Link or SNAP card. R. 33, 35. In sum, the ALJ's credibility analysis rest on strained readings of ambiguous language and these factors seem far removed from the relevant issue of plaintiff's headache and other related symptoms.

Plaintiff's third argument is that the ALJ failed to consider the testimony of his mother, who provided statements about plaintiff's limitations, including his memory problems. *See* Ex. 3E. However, the ALJ did, in fact, consider this evidence, discussing it in three paragraphs. The ALJ's main reason for rejecting plaintiff's mother's opinion is that it was inconsistent with larger medical evidence—in short, that it suffered from the same flaws as did Dr. Ashaye's and Ms. Stamm's opinions. Therefore, many of the same concerns and arguments discussed above would apply to these points. The ALJ also noted that plaintiff's mother was "not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms." R. 15. Although the ALJ may consider plaintiff's mother's lack of medical training, this does not mean that her observations about such daily issues as whether plaintiff could remember taking his medication are automatically irrelevant, especially since she lived with him. *Cf.* 20 C.F.R. § 416.924a(a)(2)(i) (parents "can be important sources of information because they usually see [the child] every day").

## CONCLUSION

Despite this Court's reference to *Groundhog Day*, the Court takes Social Security appeals seriously. Indeed, the Court has previously recognized that determining whether a claimant is disabled is serious business. *Martinez v. Colvin*, No. 12 CV 50016, 2014 U.S. Dist. LEXIS

41754, *27-28 (N.D. Ill. Mar. 28, 2014). Accordingly, this Court fulfills its duty to critically review the evidence before affirming any ALJ decision. *See Eichstadt*, 534 F.3d at 665. The Court believes that most ALJs likewise seriously consider the evidence and testimony at hearings. But it is clear that the Administration's regulations and rulings regarding the treating-physician rule are not scrupulously applied. The end result is an "I-know-it-when-I-see-it" determination of disability. Claimants deserve more, and the regulations and rulings demand more.

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration. This Court makes no determination whether plaintiff is disabled. *See Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014). Instead, the Court is only remanding this case for an analysis and decision that is consistent with this opinion, an opinion that merely applies the Social Security Administration's own rules and regulations. The Court reiterates its hope that the Commissioner will address with the ALJs the systemic failure to properly analyze treating physicians' opinions. *See Duran*, 2015 U.S. Dist. LEXIS 101352 at *40.

Date: June 27, 2016          By: _____
                                  Iain D. Johnston
                                  United States Magistrate Judge